IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| MARIO CASCIARO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-50094 |
| | ) | |
| KEITH VON ALLMEN, in his | ) | Honorable Philip G. Reinhard |
| individual capacity, UNKNOWN CITY OF | ) | Courtroom 5100 |
| JOHNSBURG POLICE OFFICERS, in their | ) | |
| individual capacities, and THE CITY OF | ) | Magistrate Judge Iain Johnson |
| JOHNSBURG, | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

---

## FIRST AMENDED COMPLAINT

---

NOW COMES Plaintiff, MARIO CASCIARO, by and through his attorneys, Kathleen T. Zellner and Associates, P.C., and complaining of Defendants, KEITH VON ALLMEN, UNKNOWN CITY OF JOHNSBURG POLICE OFFICERS, and THE CITY OF JOHNSBURG, states as follows:

<u>Introduction</u>

1.  Mario Casciaro ("Plaintiff") was maliciously pursued and harassed by law enforcement for years, then wrongfully accused and charged with murder in connection with the disappearance of Brian Carrick ("Brian") almost a decade after Brian went missing.

2.  There was never any evidence suggesting that Plaintiff had any involvement in Brian's demise. On the contrary, Plaintiff had a credible alibi for

the period of time during which Brian went missing. Moreover, all of the physical evidence at the scene, as well as other evidence uncovered during law enforcement's investigation, unambiguously pointed to the true perpetrator.

3.     Nevertheless, due to the misconduct of Defendants, charges were not pursued against the actual culprit. Defendant Keith Von Allmen ("Defendant Von Allmen") withheld evidence implicating the perpetrator and diverted the investigation based on his friendship with the perpetrator's father.

4.     Through the course of the investigation, Plaintiff was arrested and charged with perjury. He was later acquitted.

5.     Plaintiff was subsequently arrested and charged with murder.

6.     Plaintiff's first trial ended in a hung jury. Plaintiff's second trial resulted in a conviction. Plaintiff was then sentenced to 26 years in the Illinois Department of Corrections.

7.     On appeal, the appellate court held that the physical evidence completely refuted the prosecution's theory of guilt and, even with the evidence fabricated by Defendants, that the evidence was insufficient to sustain Plaintiff's conviction. It therefore reversed Plaintiff's conviction outright and the charges against him were thereby dismissed.

8.     Although Plaintiff's conviction has been reversed, he has suffered greatly and will continue to suffer as a result of Defendants' misconduct. This lawsuit seeks redress for his injuries.

## Jurisdiction and Venue

9.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

10.     This Court has jurisdiction of the action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

11.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to Plaintiff's claims occurred in this judicial district and the parties resided in this judicial district at the time the events took place.

## Parties

12.     Plaintiff was at all relevant times herein a resident and citizen of the State of Illinois.

13.     Defendant Von Allmen was at all times relevant herein employed by the City of Johnsburg Police Department as a police officer.

14.     At all times relevant herein Defendant Von Allmen was acting under the color of State law and in the course and scope of his employment.

15.     Defendant Von Allmen is being sued in his individual capacity.

16.     Defendant Unknown City of Johnsburg Police Officers were at all times relevant herein employed by the City of Johnsburg Police Department as police officers.

17. At all times relevant herein Defendant Unknown City of Johnsburg Police Officers were acting under the color of State law and in the course and scope of their employment.

18. Defendant Unknown City of Johnsburg Police Officers are being sued in their individual capacities.

19. Defendant City of Johnsburg is an Illinois municipal corporation.

20. Defendant City of Johnsburg is liable for the State-law torts of its employees committed in the course and scope of their employment pursuant to the doctrine of *respondeat superior*. Defendant City of Johnsburg is also liable for any judgment entered against its employees pursuant to its statutory obligation to indemnify them.

<u>Factual Allegations</u>

*Plaintiff's Innocence*

21. On December 20, 2002, Brian went missing. Since that date, he has never been found and is presumed to have been murdered.

22. Plaintiff had absolutely nothing to do with the crime.

23. No physical evidence or any other credible evidence ever suggested Plaintiff was involved in the crime.

24. At the time of Brian's disappearance, Plaintiff's whereabouts were completely accounted for.

25. Plaintiff spoke openly, candidly and at length with law enforcement shortly after Brian went missing. He explained in detail his activities on the night

in question, identified witnesses that would corroborate his statements, provided documentary proof that he could not have been involved in harming Brian, and even directed investigators to witnesses they could speak to about the party he attended after leaving Val's Foods ("Val's") that evening. Multiple witnesses established that Plaintiff could not have committed the crime.

### Robert Render Jr.'s Guilt

26.     While there was never any evidence against Plaintiff, there was overwhelming evidence to establish that Robert Render Jr. ("Render") murdered Brian.

27.     Not only did the mountain of evidence establish Render's involvement in the crime, but it also completely exculpated Plaintiff.

### Forensic Evidence Connects Render to Murder Scene

28.     Brian and Render worked at Val's in Johnsburg, Illinois.

29.     The forensic evidence establishes that Brian's murder likely occurred at Val's, as his blood was found at locations in and about the store.

30.     Specifically, there was blood spatter, consisting of Brian's blood, in a non-public hallway east of the produce cooler.

31.     A large amount of Brian's blood was found in and about the produce cooler at the store. This blood included transfer blood.

32.     Brian's blood was also found on cardboard boxes in the trash compactor located outside the store.

33.     Based on this blood evidence, Brian was likely killed in the hallway east of the produce cooler with a sharp object, such as a box cutter or knife, or a

blunt object such as a wrench. Brian's body was then taken into the produce cooler, and then later removed from the store.

34. Apart from Brian, Render was the only other person who was forensically connected to the crime scene.

35. Render's DNA was identified as being on the door jamb of the hallway outside the produce cooler. Render was the major DNA profile on the door jamb. The minor profile was not identified because of the insufficiency of the sample.

36. The two doors leading into the produce cooler had metal handles on their exteriors and white knobs on their interiors.

37. There was a blood stain, which contained a mixture of DNA, on the metal handle of the east hallway produce cooler door. The major contributor on the hallway produce cooler door matched Render's DNA profile. A minor DNA profile was developed on the handle, but the amount was insufficient to make an identification.

38. There was a bloody fingerprint on the exterior produce cooler door handle. The blood belonged to Brian. The fingerprint belonged to Render.

39. Render's blood was also detected on the exterior produce cooler door handle, which opened into the produce room on the same side as the sink.

40. On the southeast exit door of the grocery store, there were three bloodstains consisting of transfer blood. Samples of the blood were obtained from the right of the door latch, under the latch, and near the bent handle. A single DNA profile was obtained from these samples. That DNA profile belonged to Render.

41.    In addition to leaving his blood and fingerprints all over the area where Brian was murdered and where his body was moved, Brian's blood was found on the soles of the shoes that Render wore on the day of Brian's disappearance.

42.    A small amount of Render's own blood was found on the top of his shoes and on the interior frame of Val's rear exit door.

43.    Render would later admit on several occasions to law enforcement that he knew that the forensic evidence "[did] not look good for him."

*Render's Statements and Conduct Demonstrate his Guilt*

44.    Phone records obtained during the course of the police investigation established that Brian and Render communicated immediately prior to Brian's disappearance.

45.    Later, in speaking with police, Render admitted that Brian called him on December 20, 2002, and asked him for the money that Render owed Brian for a bag of marijuana. Render told Brian that he could not give him the money. Render admitted that Brian told him that if Render did not pay him, Brian was going to "beat [his] ass."

46.    Witnesses confirmed that Brian was off-duty but came to Val's store at 6:45 p.m. on December 20, 2002. Brian was last seen in the back area of Val's looking for Render in the hallway leading to the cooler.

47.    That night Render was reported as acting "unusual," and he disappeared for approximately one and a half hours.

48.     On December 26, 2002, while he was under surveillance by law enforcement, Render was observed at his residence placing two garbage cans to the side of the road for trash pickup. A subsequent search of those cans revealed "two Fruit of the Loom brand, men's T-shirts, one short sleeve and one tank top style . . . [and] one pair of mens [sic] Fruit of the Loom brand mens underwear." The evidence was collected but never DNA tested.

49.     On December 29, 2002, Render ran away from home and was reported as missing by his father.

50.     The next day, Defendant Von Allmen observed Render on the way to his office. When Render saw Defendant Von Allmen, he fled. Officers pursued Render and arrested him for possession of drug paraphernalia. At that time Render had $80.00 in cash on his person. The Appellate Court found Render's behavior suspicious.

51.     Render told police that he "could lie without being nervous." A private examiner administered a polygraph to Render but was unable to formulate an opinion due to Render's "purposeful non-cooperation." Render refused a second polygraph by the FBI.

52.     During a pre-polygraph interview, Render was reported to have sat with an "emotionless, glassy stare."

53.     When advised that forensic analysis had led to the identification of his own blood in the crime scene, "Render sat motionless, seemingly unaffected." Render could offer no explanation for why his blood was present at the location.

Render stated that he did not remember bleeding that night or any other time at Val's.

54.     When directly confronted with the inconsistencies between his statements and that of other Val's employees, Render replied, "I can't tell you anything about that" and "[t]here's nothing I can tell you about that."

55.     When the examiner and Detective Zinke met with Render's mother and father, Mrs. Render asked the examiner what his opinion of her son was now, *i.e.,* after the completion of his interview. The examiner stated that "based on her son's evasiveness, conflicting statements, forensic analysis, and other information gleaned throughout this investigation that he (the examiner) was unable to eliminate her son from continued suspicion as to his involvement in the disappearance of Brian Carrick."

*February 15, 2007, Grand Jury Testimony*

56.     On February 15, 2007, Render testified before a grand jury.

57.     Render testified that Brian sold him drugs, and that he owed Brian $60.00 for marijuana at the time of Brian's disappearance.

58.     Render saw Brian on December 20, 2002, at around 4 p.m. at Val's when Brian was picking up his check. Render testified that Brian "probably" asked him for money, but Render told him that he had no money.

59.     Render testified that he was told that Brian later came back to Val's looking for him. Render denied seeing Brian after 4 p.m. that day, even though Render worked until closing.

9

60.     Render testified that his father did not allow him to possess cash at any time, but on the day of Brian's disappearance, Render came home with over $100.00 in cash.

61.     Render attempted to explain the presence of Brian's blood on the bottom of his shoes, the fact that his shoe prints were found in Brian's blood on the cooler floor, and the existence of his fingerprint in Brian's blood on the cooler door. According to Render, the day after Brian disappeared he was told to clean up the cooler.  Render testified that he was asked to do so even though he never worked in the produce cooler.

62.     Render could not explain the fact that his blood was found at the scene. He also could not explain why his blood was on his own shoe.

63.     Render testified that he could not remember cutting himself while at work on December 20, 2002.  However, he admitted that he possibly had something red on his jeans that date, and that he may have told his father that he spilled fruit juice.  Render could offer no explanation for how his blood would have been at the scene.

64.     Render denied seeing Shane Lamb at Val's after 4 p.m. that day.

65.     Render denied seeing Plaintiff argue with Brian the date of Brian's disappearance.

*February 2, 2010, Interview*

66.     On February 2, 2010, Defendant Von Allmen interviewed Render in the Lake County Jail in an effort to get him to implicate Plaintiff despite the fact that extensive evidence tied Render to the murder, including but not limited to: Render's blood was on the produce cooler's door jam; Render's blood was on the southeast exit door; Render's fingerprint was on the produce cooler's door handle; and Render quit his job at Val's on December 22, 2002. Further, Defendant Van Allmen personally witnessed Render's suspicious behavior when Render ran away from home on December 28, 2002, and fled from Defendant Van Allmen when Defendant Van Allmen saw him. When Defendant Van Allmen apprehended Render, Render had drug paraphernalia in his possession and his own blood on one of his shoes. There was also evidence Render cleaned up of the scene and was seen with blood on his pants the evening Brian went missing. The Appellate Court highlighted this evidence against Render in its opinion.

67.     During the interview, Defendant Von Allmen told Render that he viewed Render as a "partial victim" and that he wanted to help Render. Defendant Von Allmen further informed Render that he wanted to give Render "a new beginning."

68.     During that interview, Render asked Defendant Von Allmen, "[w]hat are you trying to get me to say?"

69.     In response to prompting from Defendant Von Allmen, Render said that he "theoretically" moved Brian's body in the garbage can from the produce

cooler to the dumpster at Plaintiff's request. Defendant Von Allmen knew this was untrue and that there was no evidence Plaintiff was involved in the murder.

70.     Render denied seeing Shane Lamb at Val's the night Brian disappeared.

### Subsequent Interview at Lake County Jail

71.     On a subsequent date, Defendant Von Allmen participated in an undocumented interview of Render at the Lake County Jail.

72.     During this interview Render said that he saw Shane Lamb standing outside the produce cooler with a knife. Render purportedly stated that he asked Lamb what he was doing, and Lamb responded by cutting Render with the knife.

73.     Render added at that time that was bleeding after being cut and he ran into a bathroom and bandaged his arm.

### February 3, 2012, Interview

74.     On February 3, 2012, an assistant state's attorney and state's attorney's investigator interviewed Render at a drug treatment facility.

75.     According to the report prepared by the investigator, Render told them that on the evening of Brian's disappearance, he heard noise coming from the produce cooler. Render stated that he walked over to investigate and observed Brian, Plaintiff, and Shane Lamb in the produce cooler. According to the report, Lamb pushed Brian in the chest and Brian fell backwards, striking his head on the metal racks on the floor of the cooler. Render then returned to the "juice aisle" in the store.

76.    When questioned about emptying a "trash can with a body inside," Render purportedly told the investigator that Plaintiff had summoned Render to assist in emptying the can.  No reasonable investigator would have believed that anything said by Render implicated Plaintiff as being involved in the murder.

*April 18, 2012, Interview*

77.    On April 18, 2012, the FBI interviewed Render.

78.    During the interview, Render stated that he made up everything during his February 2, 2010, interview with Defendant Von Allmen in order to get out of trouble and get a deal.

79.    Render told the FBI that he was stoned and high the night of Brian's disappearance. Render further stated his memory was "not very good" because he was "smoking marijuana heavily at the time" and he was "always high."

80.    Render told the FBI that his pants got wet the night that Brian disappeared because another store employee of the store, Pete DePierro, ran into him and splashed water from a bucket onto Render's pants.

81.    Render told the FBI he took the trash out from Val's the evening that Brian went missing. He observed a dark colored trash bag that was inside of the trash can and folded over with a shoe on top of it upside down. Render stated that he "dragged the can out to the dumpster and someone helped him lift it into the dumpster." Render said it may have been Eddie Carrick – Brian's brother – who helped him lift the trash can.

82.     Render further stated that he had lied during his February 3, 2012, interview.  Render stated that he never heard voices coming from the produce cooler the night of Brian's disappearance.  Render also stated that he never saw Brian, Plaintiff, or Shane Lamb in the produce cooler that night.  Render claimed that he never observed anyone, including Brian, get hit or injured that night.

83.     As far as Render's prior statements that Plaintiff requested that he assist with taking out the trash, Render told the FBI that Plaintiff's name was given to him by the investigator who conducted the interview.  No reasonable investigator would have believed Plaintiff was involved in any way in the murder.

84.     A polygraph examination was administered during the FBI interview.

85.     During the polygraph examination Render refused to answer the question "whether he participated in Carrick's disappearance in any way," although he stated that he did not "knowingly participate in Brian's disappearance."

86.     Render was found to be deceptive in his answers to the following polygraph questions:  Do you know for sure who harmed Brian Carrick that day? (Answer: No); Did you knowingly participate in Brian Carrick's disappearance in any way? (Answer: No).

*Defendant Von Allmen's Misconduct*

*Concealment of Render's Statements*

87.     Defendant Von Allmen was assigned to investigate Brian's disappearance.

88.     Defendant Von Allmen reported to Val's on December 22, 2002, and interviewed witnesses, including Anthony Gebauer ("Gebauer") and Plaintiff.

89.     Gebauer provided information inculpating Render.

90.     Gebauer told Defendant Von Allmen that Render had told him that there had been a fight in the produce cooler on the night of December 20, 2002.  No other witness had reported anything about a fight at the store.

91.     Gebauer further advised Defendant Von Allmen about additional statements Render had made to him.  Gebauer told Defendant Von Allmen that a week earlier, Render told Gebauer he was going to fight Brian.  Render said he "was going to jump Brian and he had a weapon."  Render added at that time that he "was pissed off at Brian about owing him money."  Gebauer told Defendant Von Allmen that Render had a vendetta against Brian and Render explained that he had weapons.

92.     Defendant Von Allmen did not prepare a report reflecting any of these statements and did not take proper steps to disclose them to Plaintiff.

93.     The statements, which were clearly exculpatory to Plaintiff, were never provided to Plaintiff, resulting in prejudice to Plaintiff.

94.     Had these statements been provided to Plaintiff, Plaintiff would not have been arrested or charged.

95.     Had these statements been provided to Plaintiff, Plaintiff would not have been convicted.

96.     Conversely, Plaintiff provided a full account of his activities to Defendant Von Allmen that established his non-involvement in Brian's disappearance.

### Concealment of Kepple's Statements

97.     Jacob Kepple ("Kepple") was interviewed by Defendant Von Allmen prior to the trial and he advised the police that Brian had told him shortly before he went missing that Render owed him money and he was going to charge Render interest if he did not pay the money owed.

98.     This information was obviously exculpatory to Plaintiff as it confirmed the hostility between Render and Brian at the precise time Brian went missing.

99.     Defendant Von Allmen did not prepare a report reflecting any of these statements and did not take proper steps to disclose them to Plaintiff.

100.     The statements, which were clearly exculpatory to Plaintiff, were never provided to Plaintiff, resulting in prejudice to Plaintiff.

101.     Had these statements been provided to Plaintiff, Plaintiff would not have been arrested or charged.

102.     Had these statements been provided to Plaintiff, Plaintiff would not have been convicted.

### Concealment of Lorenzo Vallone's Statements

103.     Defendant Von Allmen also interviewed Lorenzo Vallone ("Vallone"), Gebauer's supervisor at Val's, on or about December 22, 2002.    Vallone told

Defendant Von Allmen that before 7:00 p.m. on the night Brian went missing, he gave the key that opened the padlock on the southeast exit door of Val's to Render.

104.   Vallone further told Defendant Von Allmen that later that same evening, Vallone discovered the key to the southeast exit door in the padlock. Vallone reported that he removed the keys and took possession of them.

105.   This information was obviously exculpatory to Plaintiff because it showed Render committed the murder and moved and hid Brian's body.

106.   Defendant Von Allmen did not prepare a report reflecting any of these statements and did not take proper steps to disclose them to Plaintiff.

107.   The statements, which were clearly exculpatory to Plaintiff, were never provided to Plaintiff, resulting in prejudice to Plaintiff.

108.   Had these statements been provided to Plaintiff, Plaintiff would not have been arrested or charged.

109.   Had these statements been provided to Plaintiff, Plaintiff would not have been convicted.

*Concealment of Render's Underwear*

110.   On April 4, 2003, Gebauer was working on the plumbing in the men's restroom at Val's and was removing ceiling tiles to check pipes.  He went into the women's restroom and began removing ceiling tiles and underwear fell on the floor. Gebauer noted that the underwear was blood-soaked, so he took it to Vallone, the supervisor.  Gebauer also reported the discovery of the underwear to his father, John Gebauer.

111.    At approximately 4:30 p.m. that same day, Gebauer and his father put the underwear in a paper bag, drove to the Johnsburg Police Department ("JPD") with it, and gave it to the JPD. The underwear was white and had a large amount of blood on it.

112.    Given the presence of Brian's and Render's blood at the scene, the only reasonable assumption would be to surmise that the underwear was connected to Brian's disappearance.

113.    The underwear was a boy's size that could have fit Render. The underwear would not have fit Plaintiff or Shane Lamb.

114.    Gebauer was interviewed by the JPD and he told the members of the JPD how he discovered the bloody underwear.

115.    The JPD evidence logs turned over in discovery to defense counsel do not reflect that the underwear had ever been preserved or retained.

116.    Defendant Von Allmen inspected the bloody underwear and threw it away.

117.    Defendant Von Allmen did not document anything about his observations of the bloody underwear, including that the bloody underwear was a boy's size that would have fit Render but not Plaintiff or Shane Lamb. Defendant Von Allmen did not take the proper steps to disclose any thing about his observations of the bloody underwear to Plaintiff.

118.    The size of the bloody underwear alone, *i.e.*, that it would have fit Render but not Plaintiff or Shane Lamb, was clearly exculpatory to Plaintiff.

119.   Additionally, it is far more likely than not that the underwear either had Render's blood or a mixture of Render's and Brian's blood.  In either instance the underwear would have refuted Render's claim – fabricated by Defendants – that he got his and Brian's blood on his shoes from cleaning the produce cooler.

120.   Plaintiff never received the information about Defendant Von Allmen's observations about the bloody underwear and therefore Plaintiff was not able to use that information in his defense.

121.   As a result, Plaintiff was prejudiced as a result of Defendant Von Allmen's conduct in throwing away the underwear and not disclosing his observations about the underwear.

122.   Had the underwear been available to Plaintiff, Plaintiff would not have been arrested or charged.

123.   Had the underwear been available to Plaintiff, would not have been convicted.

*Concealment of Defendant Von Allmen's Motive*

124.   Defendant Von Allmen was a personal friend of Render's father, Robert Render Sr.

125.   Throughout the investigation, Defendant Von Allmen had numerous discussions with Render's father about the case.

126.   Defendant Von Allmen did not prepare reports on any of these discussions or ensure that information and evidence of the discussions was properly disclosed to Plaintiff.

127. Defendant Von Allmen did not disclose his personal relationship with Render's father in any way.

128. This information was exculpatory to Plaintiff, as it would have shown Defendant Von Allmen's bias and motivation to divert the focus of the investigation away from Render and onto Plaintiff.

129. This information was also exculpatory because it would have accounted for Render's evolving narrative of what occurred the night of Brian's disappearance and his efforts to explain the overwhelming forensic evidence of his guilt.

130. As a result of Defendant Von Allmen concealing the nature of his relationship with Robert Render Sr. and as a result of Defendant Von Allmen concealing his discussions with Robert Render Sr., Plaintiff was prejudiced.

131. Had Defendant Von Allmen disclosed the nature of his relationship with Robert Render Sr. and his discussions with Robert Render Sr., Plaintiff would not have been arrested or charged.

131. Had Defendant Von Allmen disclosed the nature of his relationship with Robert Render Sr. and his discussions with Robert Render Sr., Plaintiff would not have been convicted.

*Defendant Von Allmen Diverted the Investigation Away from Render and Caused the Investigation to Focus on Plaintiff*

132.    As shown in great detail above, from the very beginning of the investigation, overwhelming evidence pointed toward Render as the murderer.

133.    In addition, Render did not have an alibi for the time in question.

134.    In contrast, there was never any evidence that Plaintiff had committed the murder.

134.    In addition, Plaintiff had an alibi precluding the possibility that he could have murdered Brian.

135.    Still, Defendant Von Allmen diverted the investigation away from Render and caused the investigation to focus on Plaintiff.

136.    Defendant Von Allmen moved the investigation from an evidence based investigation to a suspect based investigation targeting Plaintiff.

137.    Contrary to established principles of law enforcement, Defendant Von Allmen eliminated Render as a suspect despite the presence of pertinent facts and evidence demonstrating Render's potential guilt.

138.    Also contrary to established principles of law enforcement, Defendant Von Allmen continued to pursue Plaintiff as a suspect despite the presence of pertinent facts and evidence demonstrating Plaintiff's innocence.

*Plaintiff's Wrongful Conviction*

139.   Because the aforementioned exculpatory evidence was withheld from Plaintiff, Plaintiff was arrested and prosecuted for Brian's disappearance and murder.

140.   Plaintiff was prejudiced in that he was denied the opportunity to introduce the evidence withheld by Defendant Von Allmen that irrefutably pointed toward Render as the sole perpetrator.

141.   On April 2, 2013, as a result of Defendants' misconduct, Plaintiff was convicted of felony murder predicated upon the crime of intimidation.   He was sentenced to 26 years in the Illinois Department of Corrections.

*Plaintiff's Exoneration*

142.   On September 17, 2015, the Appellate Court of Illinois, Second Judicial District, reversed Plaintiff's conviction.

143.   The Appellate Court held, after reviewing the evidence and the State's theory, that the evidence was insufficient to sustain the conviction because it was "so lacking and improbable."

144.   The Court concluded, in fact, that the State's theory of guilt was not supported by any evidence at all, holding, "The physical evidence and the testimony of disinterested witnesses show that whatever happened to [Brian] could not have been what Lamb portrayed."

145.  On September 23, 2015, Plaintiff was released from the Illinois Department of Corrections pending the State's petition for leave to appeal to the Supreme Court.

146.  On December 17, 2015, the State filed a petition for leave to appeal.

147.  On March 30, 2016, the Supreme Court denied the petition.

*Plaintiff's Injuries*

148.  As a direct result of Defendants' conduct, Plaintiff sustained physical injuries and damages including loss of his freedom, pain and suffering, severe mental anguish, emotional distress, loss of income, inadequate medical care, humiliation, indignities and embarrassment, degradation, permanent loss of natural psychological development, and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and freedom of speech and expression.

## COUNT I

## 42 U.S.C. § 1983

## 14th Amendment – Due Process

## (Against Defendant Von Allmen and Unknown City of Johnsburg Police Officers)

149.   As described more fully above, Defendant Von Allmen and Unknown City of Johnsburg Police Officers, while acting individually, jointly, and in conspiracy, deprived Plaintiff of his constitutional right to a fair trial.

150.   In the manner described more fully above, Defendant Von Allmen and Unknown City of Johnsburg Police Officers deliberately withheld material exculpatory evidence, thereby misleading and misdirecting the investigation and criminal prosecution of Plaintiff.

150.   Absent Defendant Von Allmen and Unknown City of Johnsburg Police Officers' misconduct, the arrest, charging and prosecution of Plaintiff could not and would not have been pursued.

151.   Absent Defendant Von Allmen and Unknown City of Johnsburg Police Officers' misconduct, Plaintiff would not have been convicted.

152.   Defendant Von Allmen and Unknown City of Johnsburg Police Officers' misconduct directly and proximately caused Plaintiff's unjust criminal conviction, thereby denying Plaintiff his constitutional right to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

153.   As a further direct and proximate result of this violation of Plaintiff's constitutional right to a fair trial, Plaintiff suffered injuries, including, but not limited to, restriction of his freedom of movement, emotional distress, and mental anguish.

154.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Plaintiff's constitutional rights.

## COUNT II

## 42 U.S.C. § 1983

## Conspiracy

## (Against Defendant Von Allmen and Unknown City of Johnsburg Police Officers)

155.   Each paragraph of this Complaint is incorporated as if restated fully herein.

156.   In the manner described above and alleged herein, Defendants together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to deprive Plaintiff of his constitutional rights as alleged herein.

157.   Defendants, acting in concert among and between themselves and with unknown co-conspirators, conspired by concerted action to accomplish an unlawful purpose by unlawful means.

158.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Plaintiff without probable cause, fabricating evidence, and withholding material exculpatory and impeachment evidence.

159.   The conspiracy and overt acts were continued from on or about December 22, 2002, through to the present.

160.   Defendants' misconduct directly and proximately caused the violation of Plaintiff's constitutional rights as alleged herein.

161.   As a further direct and proximate result of Defendants' misconduct, Plaintiff suffered injuries, including, but not limited to, restriction of his freedom of movement, emotional distress, and mental anguish.

162.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with deliberate indifference to Plaintiff's constitutional rights.

## COUNT III

### Illinois Law – Malicious Prosecution

**(Against Defendant Von Allmen and Unknown City of Johnsburg Police Officers)**

163.   Each paragraph of this Complaint is incorporated as if restated fully herein.

164.  As described more fully above, Defendant Von Allmen and Unknown City of Johnsburg Police Officers maliciously initiated and/or continued a prosecution against Plaintiff without probable cause.

165.  The prosecution terminated in Plaintiff's favor on March 30, 2016, in a manner indicative of innocence.

166.  As a direct and proximate result of Defendant Von Allmen and Unknown City of Johnsburg Police Officers' misconduct, Plaintiff suffered injuries, including, but not limited to, restriction of his freedom of movement, emotional distress, and mental anguish.

## COUNT IV

### Illinois Law – Intentional Infliction of Emotional Distress

### (Against Defendant Von Allmen and Unknown City of Johnsburg Police Officers)

167.  Each paragraph of this Complaint is incorporated as if restated fully herein.

168.  In the manner described above and alleged herein, the acts and conduct of Defendant Von Allmen and Unknown City of Johnsburg Police Officers were extreme and outrageous.  Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

169.  Said actions were undertaken with malice, willfulness, and with reckless indifference to the rights of Plaintiff.

170.   As a direct and proximate result of Defendant Von Allmen and Unknown City of Johnsburg Police Officers' wrongful acts, Plaintiff suffered damages, including severe emotional distress and anguish.

## COUNT V

### Illinois Law – Conspiracy

### (Against Defendant Von Allmen and Unknown City of Johnsburg Police Officers)

171.   Each paragraph of this Complaint is incorporated as if restated fully herein.

172.   In the manner described above and alleged herein, Defendant Von Allmen and Unknown City of Johnsburg Police Officers together reached an understanding, engaged in a course of conduct, engaged in a joint action, and otherwise conspired among and between themselves to maliciously prosecute Plaintiff without probable cause and intentionally inflict emotional distress.

173.   In furtherance of the conspiracy, each of the co-conspirators engaged in and facilitated numerous overt acts, including but not limited to arresting Plaintiff without probable cause, fabricating evidence, and withholding material exculpatory and impeachment evidence.

174.   Said conspiracy and overt acts were continued from on or about December 22, 2002, through to the present.

175.   As a direct and proximate result of Defendant Von Allmen and Unknown City of Johnsburg Police Officers' misconduct Plaintiff suffered injuries,

including, but not limited to, restriction of his freedom of movement, emotional distress, and mental anguish.

## COUNT VI

### Illinois Law – Respondeat Superior

### (Against Defendant City of Johnsburg)

176.   Each paragraph of this Complaint is incorporated as if restated fully herein.

177.   At all times relevant to this complaint Defendants Von Allmen and Unknown City of Johnsburg Police Officers acted as agents of, and in the course and scope of their employment with, Defendant City of Johnsburg.

178.   Defendant City of Johnsburg is liable as principal for all state-law torts committed by their employees in the course and scope of their employment.

## COUNT VII

### Illinois Law – Indemnification

### (Against City of Johnsburg)

179.   Each paragraph of this Complaint is incorporated as if restated fully herein.

180.   Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment.

181.     Defendants Von Allmen and Unknown City of Johnsburg Police Officers are or were employees of Defendant City of Johnsburg who acted within the course and scope of their employment in committing the misconduct herein alleged.

### Prayer for Relief

Wherefore Plaintiff, Mario Casciaro, respectfully requests that this Court enter judgment in his favor and against Defendants, awarding compensatory damages, costs, and attorneys' fees, as well as punitive damages against all Unknown City of Johnsburg Police Officers, and any other relief this Court deems just and appropriate.

### Jury Demand

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

/s/ Kathleen T. Zellner
Kathleen T. Zellner
Reg. No. 6184574
Kathleen T. Zellner & Associates, P.C.
1901 Butterfield Road, Suite 650
Downers Grove, Illinois  60515
Phone:  630-955-1212
Fax:  630-955-1111
Email:  kathleen.zellner@gmail.com

**CERTIFICATE OF SERVICE**

The forgoing, FIRST AMENDED COMPLAINT has been electronically filed on June 20th, 2017. I certify that I have caused the forgoing FIRST AMENDED COMPLAINT to be served on all counsel of record via CM/ECF electronic notice on June 20th, 2017.

Respectfully submitted,

_/s/ Kathleen T. Zellner_
Kathleen T. Zellner

KATHLEEN T. ZELLNER & ASSOCIATES
1901 Butterfield Road
Suite 650
Downers Grove, Illinois 60515
(630) 955-1212